[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff was the owner of a large, four-story warehouse located at 104 Ferry Street in New Haven (the "premises"). Beginning in 1973, the plaintiff rented substantially the entire basement of the premises to the defendant corporation. The defendant vacated the basement on April 7, 1988 after a summary process action had been instituted and taken to judgment by stipulation. The plaintiff brings this action to recover judgment for rent and use and occupancy through April 7, 1988 and for reimbursement for expenses incurred in disposing of certain hazardous materials allegedly stored at the premises by the defendant.
The plaintiff alleged and proved that the defendant did not pay any rent for the months of February and March, 1987. On or about March 13, 1987, the defendant was served with a notice to quit. A summary process action was later brought and on June 30, 1987, the parties entered into a written stipulation for judgment of possession for the plaintiff with a stay of execution through September 30, 1987. The defendant remained in possession until April 7, 1988. The plaintiff seeks judgment for $600 per month rent for February and March, 1987, and $600.00 per month as reasonable use and occupancy from April 1, 1987 through April 7, 1988, plus interest.
The defendant filed a special defense to the claim for rent and use and occupancy alleging that "[t]hroughout Defendant's tenancy, there were numerous floods which caused Defendant to vacate the demised premises . . . ." The defendant failed, however, to sustain its burden of proof with respect to this defense. CT Page 9947 Although the president of the defendant testified that the basement flooded at various points throughout the approximate fifteen-year tenancy, there was no evidence at all that the defendant vacated the basement as a result of the flooding. The defendant remained in continuous occupancy for approximately fifteen years, including the period from February 1, 1987 to April 7, 1988.
The defendant's allegations in its special defense raised the defense of constructive eviction. However, a defendant cannot prevail upon a defense of constructive eviction if he remains in possession, as the defendant did here. Hayes v. Capitol Buick Co., 119 Conn. 372, 379 (1935); S. H. V. C. v. Roy, 37 Conn. Sup. 579,586 (1981). The court finds for the plaintiff with respect to the defendant's special defense.
Although the defendant filed only this single special defense, Paul Spinnato, the president of the defendant, testified at trial that no rent or use and occupancy was owed because of an agreement which he had with Myles Alderman, the president of the plaintiff. Mr. Spinnato claimed to have an agreement with Mr. Alderman that if the defendant's employees would clean out the refuse left on various floors of the premises by other tenants, Mr. Alderman would not claim any rent from the defendant. This defense, in the nature of release or accord and satisfaction, must be raised by special defense. Practice Book 164. It was not raised by special defense in the answer and no request to amend was made at trial. This defense therefore is not properly before the court.
Defendant's counsel also made a post-trial claim that use and occupancy cannot be awarded unless demand is made. His argument purportedly rests on various sections of the Landlord and Tenant Act, 47a-1 et seq. However, such reliance is misplaced, for the Act does not apply to commercial leases. Hoban v. Masters,36 Conn. Sup. 611, 613 (1980).
The plaintiff is entitled to judgment for $600.00 rent for both February and March, 1987, $600.00 being the monthly rent agreed upon between the parties. The court further finds that $600.00 per month was the fair rental value for the basement of the premises from April 1987 to April 7, 1988, while the defendant remained in occupancy. The plaintiff is entitled to a total of $8,540.00 damages for rent and use and occupancy. The plaintiff also seeks an award of interest pursuant to Conn. Gen. Stat. 5373a. The court finds that an award of interest is appropriate here where the defendant withheld payment of rent and use and occupancy without a defense of any apparent merit. The defendant stopped paying rent after January of 1987 because it received notice that the premises were being sold and that the defendant, a month-to-month CT Page 9948 tenant, would be required to vacate. Interest on this portion of the judgment is calculated at $3,476.28.
The plaintiff's second claim is for reimbursement for costs incurred by the plaintiff in disposing of certain hazardous materials allegedly stored at the premises by the defendant. There is no dispute that the plaintiff spent $7,382.22 to dispose of certain chemicals discovered at the premises on or about February 19, 1988, nor that the plaintiff incurred this expense because as the property owner, it was ordered to dispose of the chemicals by a representative of the Connecticut Department of Environmental Protection ("DEP"). The dispute is whether the defendant was the owner of the chemicals. Conn. Gen. Stat. 22a452 provides that a person or corporation which removes hazardous waste shall be entitled to reimbursement for the cost of doing so from the person or corporation responsible for the hazardous waste.
On Friday, February 18, 1988, the New Haven Fire Department responded to the premises to pump water from the boiler room in the basement. (The boiler room was not part of the premises leased to the defendant.) While setting up pumping equipment, the firemen noticed several deteriorated fiber drums stacked outside on the loading dock of the premises. Some of the drums were marked "sodium copper cyanide" and a powdered material was leaking from the drums. Lt. Michael Grant, the department safety officer for hazardous material releases, was called to the premises because cyanide is poisonous and hazardous.
When Lt. Grant came to the premises, he was told that the materials in question belonged to the defendant, which was in the process of moving out of the basement. Lt. Grant then spoke with Mr. Spinnato, the president of the plaintiff. Mr. Spinnato admitted that he was the owner of the chemicals and told Lt. Grant that he was in the process of attempting to sell the materials. Lt. Grant discussed the situation with the DEP and it was agreed between Lt. Grant, the DEP and Mr. Spinnato that the drums should be repackaged and put inside the building over the weekend in order to give the defendant time to accomplish the sale. Lt. Grant told Mr. Spinnato that he would return early the next week to verify that the hazardous material had been sold and removed from the premises. Lt. Grant did not leave until he had watched Mr. Spinnato put the deteriorated drums inside larger, secure drums and move all the drums inside the warehouse.
On February 23. 1988, Lt. Grant returned to the premises with Benedict York, a DEP senior emergency response coordinator charged with the duty of responding to oil and chemical emergencies on behalf of the DEP. The chemical containers were still at the premises and Mr. Spinnato now denied that the chemicals belonged CT Page 9949 to the defendant. As a result of the defendant's denial of ownership and refusal to take responsibility, Mr. York, in accordance with state statutes, ordered the plaintiff owner of the premises to dispose of the hazardous chemicals. As required, the plaintiff hired a specially licensed contractor to dispose of the materials.
There is no dispute between the parties that the drums were placed on the loading dock by Jeff Spinnato, an employee of the defendant and Paul Spinnato's son. Jeff Spinnato admitted that in using a forklift to place the drums on the loading dock, he pierced one of the containers. However, Jeff Spinnato and his father testified that the drums were brought down from the second floor of the premises, not brought up from the basement, which was the only portion of the warehouse occupied by the defendant. The plaintiff admitted that the defendant was given permission to remove and use some 2' X 4's and cardboard boxes on the second floor of the premises in an effort to hasten the defendant's moving out, but witnesses for the plaintiff testified that the defendant's employees did not have access to the second floor in furtherance of this agreement until after the end of February.
The defendant's contention is that the cyanide drums bore the name "Marlin Firearms" and that Marlin Firearms was a tenant of the premises in the early 1970's. Paul Spinnato further denied having admitted to Lt. Grant that he owned the chemicals and he claimed to have discussed the matter with a different official from DEP, who allegedly arrived at the premises before the firemen.
The court finds that the hazardous chemicals in question belonged to the defendant, which stored them in the basement until removing them to the loading dock during the process of vacating the basement. The plaintiff presented a strong case, including the credible testimony of the warehouse manager, who saw Jeff Spinnato bring the chemical drums up from the basement onto the loading dock. Other witnesses testified that they had observed barrels or drums in the basement during the defendant's occupancy. The same witnesses did not recall seeing barrels or drums on any of the upper floors.
The court credits Lt. Grant's testimony that Paul Spinnato initially admitted that the chemical belonged to the defendant and that he tried to make some money by arranging the sale of the chemicals. (Paul Spinnato admitted that he made phone calls seeking to dispose of the chemicals and that he did re-pack the chemicals, but nevertheless denied owning the chemicals.) The fiber drums showed water marks and other signs of wetness, additional evidence that they had been stored in the basement, which did undergo some periodic flooding. CT Page 9950
The defendant's contentions were at best uncorroborated and in several respects contradicted by other reliable evidence. Photographs of the deteriorated drums do not show "Marlin Firearms" visible anywhere on the barrels. No one but the Spinnato testified to seeing "Marlin Firearms" on the barrels. Mr. Alerman, whose familiarity with the premises dates to 1967, testified that Marlin Firearms was never a tenant. He detailed the identity of all tenants of the premises beginning in the 1970's. None of them, except the defendant, which is engaged in the business of metal fabrication, had any apparent connection with cyanide or other chemicals. Finally, although Paul Spinnato testified that he knew on February 19, 1988 that the chemicals were brought from the second floor to the loading dock by his son, he later responded to plaintiff's interrogatories without disclosing this information, claiming instead that he had no knowledge. The court does not find the testimony of Paul Spinnato or Jeff Spinnato credible.
The plaintiff is to be awarded $7,382.22, the expense incurred by the plaintiff to have the hazardous chemicals removed from the premises and properly disposed of. The plaintiff seeks interest on this portion of the judgment also in accordance with Conn. Gen. Stat. 37-3a. Interest is appropriate on this award because these funds were expended by the plaintiff in compliance with the order of the DEP and plaintiff has been deprived of the use of the money. Interest is calculated at $2,195.70.
Judgement is entered for the plaintiff for a total of $15,922.22 damages, plus $5,671.98 interest, plus costs.
VERTEFEUILLE, J.